## STATE OF CONNECTICUT *v.* HOWARD STOVALL
## (11846)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued December 11, 1985—decision released March 11, 1986

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Henry J. Lyons,* assistant state's attorney, for the appellee (state).

DANNEHY, J. The information against the defendant, Howard Stovall, accused him of one count of burglary in the first degree in violation of General Statutes

§ 53a-101 (a) (1), two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a), and one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3). The underlying criminal acts which gave rise to the multicount information were perpetrated in the Art Cine Theatre in Stamford on January 20, 1981. The information charged that the defendant entered the theatre unlawfully while armed with a knife and twice sexually assaulted a female employee, before committing an armed robbery. The defendant did not dispute the fact that the crimes were committed. He contended that he was not the person who committed the crimes. Following a trial by jury, the defendant was found guilty on each count and sentenced to imprisonment for an effective term of twenty-two to forty-four years.

The defendant, on appeal, presents two issues. The first concerns the admission into evidence of a third "mug shot" type of photograph of the defendant. The second alleges a violation of the trial court's sequestration order. Such facts as are pertinent to resolve the issues will be summarized therewith.

The testimony adduced at trial is substantially as follows. The victim was a cleaning woman at the Art Cine Theatre in Stamford, where she worked each night after the theatre closed. On January 20, 1981, as she removed a vacuum cleaner from a closet in the darkened theatre, the defendant grabbed her from behind, placed a knife to her side, and told her he would cut or kill her if she said anything. He then dragged her into an alcove of the building and slammed her against the wall. In the unlit alcove the struggling woman could not clearly see the face of the man pressing her against the wall. She asked the man what he wanted and explained she had no money. Thereupon the defendant demanded that she undress. The defendant then terrorized and sexually assaulted his victim. The

defendant then forced her to go with him to the candy counter in the lobby of the theatre where her purse was. The lobby in the area of the candy counter was illuminated by two street lights. At the candy counter the victim had ample opportunity to view the defendant. She testified that she was able to observe his facial features, at close range, under good lighting conditions, and throughout the whole time spent at the candy counter. Before leaving, the defendant threatened to kill the victim if she notified the police. He then left the theatre by the back door with a pen knife and a couple of dollars which he had removed from the victim's purse. The victim dressed, made a telephone call to her husband, and went home.

At police headquarters the following day the victim gave the police a detailed description of her assailant by height, weight and build. Ralph Weed, a Stamford police officer, drew a composite picture which satisfied the victim. She looked through perhaps several hundred photographs kept in the identification files of the Stamford police department but she made no identification. On January 23, 1981, the police showed the victim two separate arrays consisting of sixteen photographs and again she made no identification. The defendant's picture was not among those examined on either occasion. The police investigation continued until, on September 10, 1981, the victim was asked by Sergeant Robert Toner, another Stamford police officer, to view photographs at the Stamford police station. The victim was shown sixteen mug shots arranged in groups of eight. The victim picked out the defendant's picture from each group. None of the mug shots portrayed the defendant wearing glasses. There was no objection at trial either to the victim's in-court identification or to the introduction into evidence of the mug shots involved.

The defendant's claim of error with regard to the admission into evidence of a third mug shot relates to

the following circumstances. At trial, the defendant vigorously contested the reliability of the evidence identifying him as the perpetrator of the crimes with which he had been charged. The defendant cross-examined the victim extensively about her ability to describe her assailant under the lighting conditions that prevailed at the scene of the crime. The state then presented the testimony of the two police officers, Weed and Toner, who had assisted in the procedures that led the victim to identify the defendant. Weed was asked, referring to the two mug shots of the defendant previously introduced without objection during the victim's testimony, whether he could identify the defendant. He replied in the affirmative and pointed out the defendant as "[t]he gentleman . . . with the glasses." The defendant was wearing glasses at trial. Neither of the photographs already in evidence showed the defendant wearing glasses. In the victim's testimony, she had not referred to the defendant as wearing glasses. The prosecutor then showed Weed a third photograph and elicited testimony that the picture depicted the defendant without glasses on September 17, 1981, eight months after the date of the crime. The defendant objected to the introduction of the third photograph as irrelevant and prejudicial. The prosecutor claimed the photograph was admissible to show that the defendant did not always wear glasses.

The trial judge properly overruled the defendant's objection to the admission of the third mug shot of the defendant. We have frequently pointed out that any use in evidence of photographs ordinarily found in police identification files will suggest to the jury that the defendant may have a criminal record and that indiscriminate use of mug shots is undesirable. *State v. Pecoraro,* 198 Conn. 203, 206, 502 A.2d 396 (1985). Here, however, the prosecutor did not offer the photograph indiscriminately. He quite properly refrained

from introducing it during the direct examination of the victim, when he elicited the details of her identification. At that time it was of minimal significance as corroboration. The defendant, on cross-examination of the victim, however, tried to cast doubt on her identification testimony. Thus, he tried to show that she would be unable to see the defendant under the artificial lighting in the lobby she described. At this point, the trial judge could properly have found that the admission of the third photograph as corroboration was justified.

Moreover, outside the presence of the jury the trial judge suggested masking the placard shown on the third photograph. The defendant was unwilling to mask any writing and asked that the picture be exhibited without any covering. In any event, the admission of the third mug shot was minimally prejudicial, if at all, since defense counsel had previously elicited testimony from the victim, before the jury, that she had made an identification from mug shots on September 10, 1981. Also, the trial judge charged the jury to disregard and draw no inference from the date on the mug shot.

We next address the defendant's claim that he was denied a fair trial by the action of the trial court in violating its own sequestration order. At trial, during cross-examination of the victim, defense counsel attempted to impeach her by questioning her about an alleged inconsistency between her testimony at trial and her earlier testimony during the pretrial suppression hearing. The alleged inconsistency concerned the victim's testimony as to when she first had an opportunity to view her assailant's facial features. As has been noted, the victim testified that she was sexually assaulted in a darkened alcove of the unlighted theatre and then taken by her assailant to the candy counter where he examined the contents of her pocketbook. Cross-examination at trial proceeded as follows:

"Defense Counsel: The first chance that you had to observe the face of your assailant was at the candy counter, is that correct?

"The Witness: I saw an outline of his face in the alcove, you know, like I could tell his features.

"Defense Counsel: Oh, you say you could tell his features?

"The Witness: I could see his features, sure. I could see that he was a man. I could see certain things about him, yes.

"Defense Counsel: Do you recall testifying, I believe, earlier this week in regards to this matter?

"The Witness: Yes, I do.

"Defense Counsel: And do you recall at that time, I asked you a question and I said, 'so the first opportunity to see the man's face occurred after the assault by the candy counter when he brought your pocketbook over?' And do you recall answering, 'right.' "

At this point the state's attorney objected to the question and the jury was excused. Defense counsel requested that the witness also be excused from the courtroom, in accordance with a sequestration order previously entered by the trial court, so that she would not be present during the ensuing discussion of the alleged inconsistency in her testimony. Practice Book § 876 provides that "[t]he judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or *during any part of the trial in which he is not testifying."* (Emphasis added.) See General Statutes § 54-85a. The purpose of a sequestration order is to prevent a witness from fashioning his testimony to correspond to the statements of others in the courtroom; see State v. *Pikul,*

150 Conn. 195, 200, 187 A.2d 442 (1962); including the statements of counsel. While the trial court should have excused the witness during discussion by counsel of an alleged inconsistency in her testimony, we cannot conclude in this case that the failure to do so was probably harmful to the defendant.

In the course of the colloquy which followed, the alleged inconsistency was identified. At the hearing on the motion to suppress, the witness had testified that while in the dark alcove she could only see the "outline" of her assailant's features, while at trial she testified, as quoted above, that she could make out his "features." According to the witness, in testimony given both at the suppression hearing and again at trial, she had not had a good opportunity to view her assailant until she stood with him near the candy counter. The trial court, noting that "outline of features . . . is different than features," overruled the state's objection. The trial court then called a recess during which the attorneys were afforded the opportunity to review the transcript of the suppression hearing to determine whether the witness' trial testimony was, in fact, inconsistent.

When court reconvened and the jury was seated, defense counsel resumed cross-examination of the victim. Although he did not renew his question asked just before the recess, counsel's cross-examination was searching and unrestricted, covering all aspects of the victim's opportunity to view her assailant and her ability to identify him. We are not apprised of the reason that counsel chose not to renew the question which now forms the basis, in part, of this claim of error on appeal. The defendant claims that the question was not renewed because the witness had been present during the colloquy on her alleged testimonial inconsistency, and therefore would have conformed her trial testimony accordingly. We do not agree. Under the circum-

stances, it appears that trial counsel chose not to pursue the question because he concluded, as have we, that any purported inconsistency between the witness' testimony on the motion and her testimony at trial was marginal in the extreme. There is little or no impeachment value in a prior statement such as "I could see the outline of his features" when offered to contradict testimony such as "I could see his features," "I could see that he was a man," and "I could see certain things about him." This, essentially, is the impeachment evidence the jury would have had before it, had the assistant state's attorney not objected when he did.

The burden is on the defendant to show prejudice in the trial court's failure to observe its sequestration order; *State* v. *Silveira,* 198 Conn. 454, 479, 503 A.2d 599 (1986); *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980); and we do not see what harm could possibly have resulted from the victim's presence in the courtroom during the colloquy. While it is true that during that colloquy both counsel and the trial court discussed their recollections of the witness' prior testimony, defense counsel himself had already informed the witness what that testimony was by asking her if she recalled it. Even assuming that the witness, in response to counsel's question, had testified that she could not recall her prior testimony, or worse, that she denied it completely, the inconsistency that would have been exposed is too technical, too minor in nature, to have had a significant impact on her credibility. Moreover, the inconsistency, if any, could easily have been explained away on redirect by the state. The victim's prior testimony to the effect that she saw only an "outline" of her assailant's features is not so definite and unambiguous as to preclude further, consistent and, no doubt, damaging elucidation. Defense counsel most likely perceived that the victim's inevitable explana-

tion of the purported inconsistency, if pursued, would only have resulted in the witness clarifying what she meant by "outline of his features." It would thus appear that the defendant's position after the colloquy was no worse than it would have been had the state not objected and the colloquy never occurred. In light of these circumstances, we cannot conclude that the victim's presence in the courtroom during that colloquy harmed the defendant in any way.

There is no error.

In this opinion the other judges concurred.